571 A.2d 1236

**STATE of Maryland**

v.

**Erik O'Brien SELBY.**

**No. 93, Sept. Term, 1988.**

Court of Appeals of Maryland.

April 10, 1990.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for petitioner.

Gary S. Offutt, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL,* JJ.

McAULIFFE, Judge.

Erik O'Brien Selby left his home in Washington, D.C., at 5:15 a.m. on 3 September 1985, walking toward Silver Spring, Maryland. He carried with him, concealed on his person, a 14 inch butcher knife with a nine inch blade. On his journey, he stole a small quantity of marijuana and some loose change from a parked automobile. He proceeded to an office building in Silver Spring, arriving at about 7:30 a.m. Entering the building, he went up the stairs to the third floor, unscrewed several light bulbs at one end of the hallway, and propped partially open a door leading to the stairwell. There he lay in wait for someone to rob, smoking marijuana as he waited.

Chung Sook Choi approached her place of employment on the third floor of the office building at about 7:45 a.m. that morning. As Choi faced the door of her office, opening the two locks that secured it, Selby, with the butcher knife in his hand, rushed from his place of hiding and plunged the knife into the small of her back. Selby then withdrew the knife from Choi's back and threw it to the floor. He removed the wallet from the purse of his fallen victim, and fled.

Choi was able to make her way to the parking lot of the office building before collapsing into unconsciousness. Aid was summoned and she was promptly taken to a hospital, where emergency surgery was performed. Although Choi was very near death on several occasions, she survived. The operating physician said that the knife had caused a five inch surface wound, and had penetrated at least six inches, slicing through several back muscles, severing blood

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

vessels in the abdominal cavity, and amputating part of Choi's left kidney.

Selby was apprehended[1] and charged with attempted murder in the first degree, robbery with a dangerous and deadly weapon, and carrying a dangerous and deadly weapon openly with the intent to injure. He was tried before the court without a jury, and found guilty of all three charges. He was sentenced to life imprisonment on the first charge, and two consecutive terms of imprisonment of 18 and three years, respectively, on the second and third charges.

Selby appealed, challenging the convictions of attempted murder and carrying a dangerous or deadly weapon. The Court of Special Appeals affirmed the conviction of carrying the weapon, but reversed the conviction of attempted murder in the first degree, holding that the trial judge had not found that Selby harbored a specific intent to kill Choi, and holding that proof of such an intent was required to sustain a conviction of attempted murder. *Selby v. State,* 76 Md.App. 201, 544 A.2d 14 (1988). We granted the State's petition for certiorari to consider questions involving the attempted murder charge.

At trial, Selby did not actively contest his criminal agency in the robbery of Choi, nor the fact that he stabbed her. His defense focused on the question of his intent at the time of the stabbing. Selby said that he went to the building to commit a "snatch rob." He said he was "high" after smoking two marijuana cigarettes—that he had not intended to hurt anyone, "but at the spur of the moment, it just seemed like I charged up to her from behind, and I stuck her with the knife."

The prosecutor urged the trial judge to find Selby guilty of attempted murder on either of two alternative theories: first, that the trial judge could infer from the surrounding circumstances, and particularly from the use of a deadly

1. Selby's fingerprints were found on the light bulbs that he unscrewed, and on the paper he used to prop open the door.

weapon directed at a vital part of the body, that Selby intended to kill Choi; and second, that even if Selby did not intend to kill Choi, he certainly intended to inflict grievous bodily harm, and that such an intent would suffice to prove attempted murder. The prosecutor further argued that under either theory, the attempted murder would be in the first degree, since Selby had lain in wait for his victim.

The trial judge was persuaded by one of the prosecutor's arguments, but the parties cannot agree as to which. The State maintains that the trial judge found Selby had a specific intent to kill. The defendant maintains that the trial judge found only an intent to commit grievous bodily harm, and not the greater intent. A majority of the Court of Special Appeals panel agreed with the defendant on this point, and so do we.

Concerning the State's first contention, that the defendant harbored a specific intent to kill, the trial judge said:

The question is whether those facts alone would lead the court to find the necessary premeditation. The problem with the facts in the end is that the knife was there, but the court still has some doubt as to whether the knife was there as a potentially threatening instrument that could cause grievous bodily harm, as opposed to an instrument that was being carried directly for the purpose of killing somebody.

Accordingly, the court does conclude with regard to the first theory, that is the specific premeditated murder, that the State has not carried its burden of proof beyond a reasonable doubt, and would not be inclined to find on that theory that there was murder in the first degree.

The trial judge then considered the State's second contention:

We turn, however, to the State's alternative theory, and that is that the Defendant was lying in wait.

\*　　\*　　\*　　\*　　\*　　\*

The question is whether the watching, waiting and concealment would suffice, together with an intent to do

grievous bodily harm, to lift this to the level of first degree.

The trial judge concluded:

So the court does accept the State's theory that lying in wait is effectively an alternative to premeditated murder, and that it may be the mere infliction of injury that is in the mind of the assailant if, in fact, there is independent proof of lying in wait.

The court finds, as I stated earlier, that there is independent proof of concealment, and watchful waiting in this case. There was clearly an intent to do grievous bodily harm; witness the knife, the terrible knife.

The court, therefore, finds that the State has carried its burden of proof of attempted murder in the first degree with regard to Count 1.

Although there was apparently some confusion in the trial judge's mind between the concept of premeditation that would affect the degree of attempted murder and the specific nature of the underlying intent, i.e., whether it was to kill or to inflict grievous bodily harm, we think it clear that the trial judge entertained a reasonable doubt as to the existence of a specific intent to kill, and entered his finding based upon the argument of the prosecutor that only an intent to commit grievous bodily harm was required.

■■ This brings us to the question of whether a specific intent to inflict grievous bodily harm will suffice as an adequate alternate *mens rea* to support a conviction of attempted murder. We have today answered that question, holding in *State v. Earp,* 316 Md. 156, 571 A.2d 1227 (1990), [No. 103, September Term, 1988] that a specific intent to kill is an indispensable element of the crime of attempted murder, in either degree. It follows that the Court of Special Appeals was correct in its ruling on this point, and that we must affirm the reversal of the conviction of attempted murder.

■■ Similarly, it follows that we must again leave for another day the question of whether lying in wait serves as

an alternative aggravating factor, sufficient by itself to raise murder to the first degree, or whether lying in wait is but an example of the premeditation necessary to show first degree murder.[2] *See Ross v. State,* 308 Md. 337, 341 n. 5, 519 A.2d 735 (1987). *See also Smith v. State,* 41 Md.App. 277, 282–85, 398 A.2d 426, *cert. denied,* 284 Md. 748 (1979); *Evans v. State,* 28 Md.App. 640, 684–85, 349 A.2d 300 (1975), *aff'd on other grounds,* 278 Md. 197, 362 A.2d 629 (1976). *But cf. Bruce v. State,* 317 Md. 642, 566 A.2d 103 (1989) (attempted murder not elevated to first degree by reason of having been committed during perpetration of a felony); *Newton v. State,* 280 Md. 260, 268, 373 A.2d 262 (1977) (stating in dictum that "[t]o establish first degree murder under [Art. 27, § 407] it must be proven that the homicide was wilful, deliberate, and premeditated...."). Whatever effect lying in wait may have in determining the degree of attempted murder, it cannot serve as a substitute for the required element of a specific intent to kill.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THE COURT OF SPECIAL APPEALS TO BE PAID ONE–HALF BY MONTGOMERY COUNTY AND ONE–HALF BY RESPONDENT; COSTS IN THIS COURT TO BE PAID BY MONTGOMERY COUNTY.

---

**2.** Maryland Code (1957, 1987 Repl.Vol.) Article 27, § 407 provides that "[a]ll murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree."